349 WEST ONTARIO BUILDING CORPORATION *et al.*, Plaintiffs-Appellants, *v.* PALMER TRUCK LEASING Co. *et al.*, Defendants-Appellees.

(No. 57702;

First District (1st Division)—September 3, 1974.

468

Charles N. Salzman and Victor G. Savikas, both of Chicago, for appellants.

Solomon Gutstein and Ronald S. Cope, both of Chicago, for appellees.

Mr. JUSTICE BURKE delivered the opinion of the court:

Plaintiffs, the owner and the sublessor of improved real estate at 3636 North Talman Avenue, Chicago, brought an action against the defendants, guarantors on the sublease, for breaches by the subtenants (not parties to this action) of the covenants to pay rent and tax deposits and to repair and restore the premises. The court, sitting without a jury, entered judgment for the defendants. The plaintiffs appeal.

Plaintiff 349 West Ontario Building Corporation (hereinafter called "owner") entered into a written lease of its property, located at 3600 North Talman Avenue and 3636 North Talman Avenue, with plaintiff Donald Bruce & Co. (formerly Medicated Products Company and hereinafter called "Bruce"). The lease is dated November 15, 1956, and describes a lease term from January 1, 1957, to December 31, 1969. On or about November 25, 1959, plaintiff Bruce entered a sublease with Health-A-Teria, Inc., and Sherwin-Gail Company for the property at 3636 North Talman. Plaintiff owner acknowledged and agreed to the sublease, but absolved the subtenants of any liability to it for a breach by plaintiff Bruce. The sublease was for 10 years, beginning January 1, 1960, and ending December 31, 1969. The defendants, Palmer Truck Leasing Co., Eugene Sorinsky (the president and principal shareholder of Health-A-Teria, Inc. and Sherwin-Gail Co.), Irving Epstein, Arthur B. Shellist, Manuel Shellist and Irving Shellist, guaranteed the performance of the terms, conditions and covenants of the sublease.

At the time the sublease was signed, the premises were occupied by a tenant named Empire Amerex. The sublease notes the possession of this tenant and indicates the intention of Empire Amerex to vacate by December 31, 1959. The sublease then specifically absolves the plaintiffs of any responsibility for insuring the exit of Empire Amerex. Although the date set for the subtenants' possession was January 1, 1960, the sublease provides that the obligation to pay rent would not commence until possession if possession were delivered after January 1, 1960.

Late in 1967 the two subtenants experienced financial difficulty. Sherwin-Gail was involuntarily dissolved on November 14, 1967, and Health-A-Teria was adjudicated a bankrupt on March 21, 1969. Plaintiffs allege in their complaint that Sherwin-Gail Co. vacated and abandoned the subleased premises on or before the date on which it was involuntarily dissolved. The complaint also alleges that Health-A-Teria, Inc., remained in possession of the premises until May 15, 1968, when it vacated and abandoned the premises. The plaintiffs contracted to sell the property on or about September 1, 1968, to Austin-Continental Corporation, which is not a party to these proceedings.

The subtenants paid rent and tax deposits through March, 1968, and paid $1500 toward the rent due for April, 1968. In Count I of the complaint, plaintiff Bruce seeks rental payments and tax deposits for the period April 1, 1968, through October 8, 1968 (with credit for the $1500 paid towards April's rent), in the amount of $26,987.24. Plaintiff Bruce also seeks the sum of $98,103.98, as the reasonable cost of necessary repairs to restore the subleased premises, plus attorneys' fees and costs. In Count II of the complaint, plaintiff owner makes substantially the same claims as plaintiff Bruce. At trial, however, the defendants had stricken the part of Count II claiming unpaid rentals by plaintiff owner, since plaintiff Bruce satisfied all rent payments under the prime lease.

In the course of the trial the defendants argued that the subtenants were not put in possession of the leased premises until May, 1960, 5 months after the date mentioned in the sublease for delivery of possession. They contend that, since the subtenants paid rent for the 5 months during which they did not have possession, they should be given credit for those payments against any rentals claimed for the months at the end of the term. Similarly, they argued that the deposits for taxes which were, under the terms of the sublease, to be applied toward any taxes due and payable during the term of the sublease, were adequate to cover any taxes the subtenants owed. The plaintiffs had computed the taxes owed as damages by including a ratable portion of the taxes for 1968, the bill for which would not arrive until 1969. The trial judge decided in favor of the defendants on these arguments. When the amounts of rent and tax deposits were computed, the defendants owed nothing.

Regarding the covenant to repair and restore the premises, Mr. Louis Solomon, the president and principal shareholder of both plaintiffs, testified as to the condition of the subleased premises as of November, 1969, when the sublease was signed, and as of the time the defendants vacated the building. The cost of repairs was testified to by representatives of the buyer of the building, who presented evidence of expenditures they incurred. The plaintiffs also offered a witness qualified to value real

estate in the area. The court refused to allow him to testify, whereupon the plaintiffs made an offer of proof, consisting of the witness' opinion that due to the deteriorated condition of the building, it sold for $60,000 less than it would if rehabilitated. The court found for the defendants and against the plaintiffs on this issue as well as on the issue of breach of the covenant to pay rent and tax deposits. Its decision was embodied in a judgment order dated March 28, 1972, in which the plaintiffs' complaint was ordered dismissed.

The plaintiffs claim that the court erred in finding no damages for breach of the covenant to pay rent on the sublease from April 1, 1968, to October 8, 1968, the date on which the sale of the premises was closed. The court determined after hearing evidence that the sublessees did not have complete possession of the leased premises until May, 1960, for the reason that the prior tenant, Empire Amerex, occupied at least part of the premises until then. During the period January 1, 1960, through May, 1960, the sublessees paid rent in the amounts required by their agreement with the plaintiffs. The court concluded that these payments were advance rentals and offset the rent that was due but unpaid during 1968 against the 1960 advances. Since the advances exceeded the unpaid rent, the court concluded that no damages were due as rent on the sublease.

. The plaintiffs argue that the court's finding that the sublessees did not have possession for the first 5 months of the sublease is against the manifest weight of the evidence. They cite evidence that even if, as claimed by the sublessees, there was another tenant in possession of the premises, the other tenant's possession was not complete. Hence, they urge, the sublessees were not deprived of possession of the rented property.

■■ We first dispose of the plaintiffs' contention that the subtenants' voluntary payment of rent for the first 5 months of 1960 establishes that they had possession of the leased premises. The sublease provides with respect to possession and the payment of rent:

"The term of this lease shall be for a period of ten (10) years, commencing January 1, 1960, and expiring December 31, 1969, to be occupied and used by Lessee for warehousing, packaging, and distributing, buying and selling of drugs, cosmetics, notions, toys, sundries, paper products, housewares, records, cigarettes, cigars, candies, gums, stationery, school supplies, wearing apparel, and kindred items. Lessee understands that there is presently a tenant in possession of the subject premises who has indicated that it will vacate on or before December 31, 1959; but Lessor does not guarantee the actions of the present tenant in possession, nor does it guarantee delivery of possession on any particular day to the Lessee herein. In the event that Lessor shall not deliver

possession of the subject premises to the Lessee on or [before] February 1, 1960, then either Lessor or Lessee, at their option, by the service of written notice upon the other party, shall have the right to cancel this lease and in which event any advance rental payments or deposits shall be returned and the parties returned to the status quo. In the event of such cancellation, the Lessor and the Lessee do hereby waive and relinquish any right or claim for damage from the other for the failure to deliver possession of the subject premises. If Lessor shall deliver possession to Lessee prior to January 1, 1960, it shall first notify Lessee of its intention so to do upon five (5) days' prior written notice and rent shall commence on a pro rata daily basis from the effective date and stated in said notice. If Lessor shall deliver possession to Lessee subsequent to January 1, 1960, rent shall not commence until the date of delivery of possession."

The plaintiffs cite a number of cases which support the rule that payment of rent is conclusive proof of the landlord-tenant relationship. (See *Mackin v. Haven*, 187 Ill. 480, 58 N.E. 448; *Voigt v. Resor*, 80 Ill. 331; *Bellows v. Ziv*, 38 Ill.App.2d 342, 187 N.E.2d 265.) No case extends this rule to that urged by the plaintiffs: that payment of rent is conclusive proof of possession of the rented premises. We see no reason for such an extension. It is common practice to require rental payments on the first day of a month. At that point it is certainly not proof of possession for the full month. A tenant may without justification fail to take possession of the rented premises, in which case the obligation to pay rent continues. On the other hand, the tenant may be denied access to the rented premises by the lessor, in which case the obligation to pay rent ceases. *Cottrell v. Gerson*, 371 Ill. 174, 20 N.E.2d 74.

The parties to this sublease agreed that, should possession be delivered after January 1, 1960, the date of possession would trigger the obligation to pay rent. The question thus becomes, *when* was possession delivered? To answer this question we must examine what is meant by the term "possession" as used in the sublease. The sublease recites:

"*   *   *   Lessee understands that there is presently a tenant in possession of the subject premises who has indicated that it will vacate on or before December 31, 1959, but Lessor does not guarantee the actions of the present tenant in possession, nor does it guarantee delivery of possession on any particular day to the Lessee herein. In the event that Lessor shall not deliver possession of the subject premises to the Lessee on or [before] February 1, 1960, then either Lessor or Lessee, at their option, by the service of written notice upon the other party, shall have the right to cancel

this lease and in which event any advance rental payments or deposits shall be returned and the parties returned to the status quo."

Essentially, these terms were the contracting parties' attempts to protect themselves against any actions of Empire Amerex.

It is not clear from the document itself what is meant by the term possession, with respect to either the subtenants or Empire Amerex. What is clear is that the sublease made no specific provision for partial possession or partial payment for partial possession. If we then regard the term "possession" as unambiguously referring to total possession, it is clear that the plaintiffs in the instant case have no claim, since the record establishes that Empire Amerex was not totally out of possession until May, 1960.

If, on the other hand, we regard the term "possession" as ambiguous, we must interpret its meaning in favor of the subtenants and against the plaintiffs who drafted the sublease. (*In re Estate of Corbin v. McKey & Poague, Inc.*, 105 Ill.App.2d 120, 245 N.E.2d 117.) This results in a finding that complete possession in the subtenants was required under the terms of the sublease before the subtenants were obligated to pay rent. Thus, the trial court's decision on this issue in favor of the defendants was not against the manifest weight of the evidence, and since the 1960 prepaid rents exceeded the 1968 unpaid rents, the plaintiffs can recover nothing.

The plaintiffs argue that the subtenants' failure to object to late possession and their continued payment of rent bars by waiver any breach on the part of the plaintiffs. Hence, they contend there should be no offset against rents due in 1968. The plaintiffs misinterpret the reason for applying the advance rentals, those paid for months not in possession, against the rents due under the contract for the last months of the sublease. The offset was not based on a breach by the plaintiffs. The sublease provided a specific term which the court simply enforced by applying amounts paid against amounts due. The rental payments during the first 5 months of 1960 were not due as a result of the specific terms of the sublease. The plaintiffs drew the contract with the knowledge that the present tenant was holding over. They provided for rental payments to begin when possession was delivered *if* possession were delivered after January 1, 1960, and *if* the subtenants (or the plaintiffs) did not elect to rescind the sublease contract before February, 1960. The court's decision followed from these provisions.

The plaintiffs' next claim is for unpaid taxes based on a clause in the sublease:

"(a) Lessee further agrees to pay as additional rent for the

demised premises all general real estate taxes and water rates and all other impositions, ordinary and extraordinary, of every kind and nature whatsoever, which may be levied, assessed or imposed upon said premises or any part thereof or upon any building or improvements at any time situated thereon or levied or assessed upon the interest of the Lessor in or under this lease, now due or accruing and becoming due and payable during the term of this lease, commencing with the general real estate taxes for the year 1960, all of which said water rates, taxes, assessments and other impositions shall be paid by the Lessee before they shall respectively become delinquent and in any case within apt time to prevent any sale or forfeiture of said demised premises therefor, or for any part thereof.

(aa) In addition to and simultaneously with the payment of the monthly installments of rent hereunder, the Lessee agrees to make monthly deposits with Lessor of amounts equal to one-twelfth ($\frac{1}{12}$th) of the annual taxes as may be levied against said real estate, based upon the amount of the most recent ascertainable tax, and the Lessor agrees to cause such sums so deposited with it to be paid to the County Treasurer on behalf of the Lessee in payment of such taxes. In the event the amounts so deposited by the Lessee on account of taxes shall not be sufficient to pay the installment of taxes falling due from time to time, then Lessee shall pay such sums as may be necessary to pay said taxes in full upon five (5) days' notice from Lessor. Once each year when bills are issued by the County Collector an accounting shall be had between the parties in connection therewith. If any surplus funds remain to the credit of the Lessee, then such surplus shall be credited to the tax reserve for the next tax to become due and payable."

The subtenants' obligation to pay taxes is solely a result of this clause. They did not make tax deposits after April, 1968.

The plaintiffs argue that the subtenants were liable for the 1968 taxes, based on the terms of the sublease. They cite a number of cases involving the nature of the real property tax lien in Illinois. They argue that since the taxes were *imposed* before the end of the sublease, they were the responsibility of the subtenants. We do not agree.

As with the rent issue, the issue of tax deposits requires an interpretation of the terms of the sublease. This means an analysis of the obligation to make monthly deposits equal to one-twelfth of the most recent real estate tax bill in order to pay the real estate taxes "which may be levied, assessed or imposed * * * now due or accruing and becoming due

and payable during the term of this lease * * *." The plaintiffs argue that the subtenants (hence the defendants) owe tax deposits to pay the 1967 and a ratable share of the 1968 taxes. The defendants argue that the status of the 1967 tax obligation is different from that of the 1968 tax obligation. They contend that the subtenants were required by the sublease to pay the 1967 taxes because they became due and payable during the term of the sublease. Since the 1968 taxes became due and payable upon receipt of the 1968 bill in 1969, those taxes were not due and payable during the term of the sublease and the subtenants were not required to pay them. The tax escrow was sufficient to pay the 1967 taxes. The defendants contend and the trial court agreed that the subtenants were not liable for the 1968 taxes and the plaintiffs may not recover additional tax deposits from them or the defendants.

We conclude that the subtenants were liable for real estate taxes "levied, etc." during the term of the sublease, *only if* such taxes became due and payable during the term of the sublease. No case is directly in point in interpreting the language used by the parties here. There is, however, an Illinois case involving a similar situation; *i.e.*, where the contractual language bases a tax obligation on both the time of imposition and the time of payment. (*Thornton v. Helmick*, 201 Ill.App. 592.) The parties there exchanged real estate "subject to taxes and special assessments levied and payable after the year A.D. 1911." This court determined that the critical term was "payable." It held that the purchaser was liable for special assessments which had become liens on the property prior to 1911 *if* they were payable after 1911. It is axiomatic that the same result would apply to taxes which were a lien before 1911 and payable after 1911.

■■ This decision, coupled with the applicable rules of interpretation (in favor of the party who did not draft the ambiguous term) requires the conclusion that the subtenants were not obligated to pay taxes until due and payable. There is no evidence in this record of any bill for 1968 taxes. The plaintiffs would have us accept the tax proration established at the sale of the premises as fulfilling the "due and payable" requirement. This result does not follow. The proration established the owner's tax obligation. We sustain the trial court's determination of this point.

The plaintiffs contend that the clear intent of the parties as manifested in the sublease was that the obligation to make tax deposits was to be coterminous with the obligation to pay rent. In light of our determination that the first five months' rents were advances, thus offsetting the subtenants' obligation to pay further 1968 rents, this argument must fall.

The plaintiffs maintain that they established the breach of the covenant to repair and restore the premises and the resulting damages, and that the

court should not have decided in favor of the defendants on this issue. The first part of the plaintiffs' argument is directed at the proof of the subtenants' liability; *i.e.*, breach of the covenant. The sublease provides:

"Lessee's taking possession shall be conclusive evidence as against Lessee that the premises were in good order and satisfactory condition when Lessee took possession. No promise of Lessor to alter, remodel or improve the premises or the building and no representation respecting the condition of the premises or the building have been made by Lessor to Lessee, unless the same is contained herein, or made a part hereof. This lease does not grant any rights to light or air over property, except over public streets kept open by public authority. *At the termination of this lease by lapse of time or otherwise, Lessee shall return the premises in as good condition as when Lessee took possession, ordinary wear and loss by fire or other casualty covered by insurance hereunder excepted, failing which Lessor may restore the premises to such condition and Lessee shall pay the cost thereof.* Lessee may remove any floor covering laid by Lessee, provided that (1) Lessee also removes all nails, tacks, paper, glue, bases and other vestiges of the floor covering, and restores the floor surface to the condition existing before such floor covering was laid, or (2) Lessee pays to Lessor, upon request, the cost of restoring the floor surface to such condition." (Emphasis ours)

Mr. Louis Solomon, the president of both plaintiffs, testified that he was familiar with the subleased premises and that he had inspected them in November, 1959. He described specific areas of the building that were in good order at that time and that, upon inspection when the subtenants vacated the premises, were in a damaged condition in May, 1968. Our decision that full possession was not delivered to the subtenants until May, 1960, coupled with testimony by an employee of the subtenants which contradicted Mr. Solomon's testimony as to the condition of the premises in November, 1959, weighs against the plaintiffs' claim of a breach by the subtenants. We will disturb a lower court's determination on an issue of fact only when the judgment is against the manifest weight of the evidence. Such is not the case here.

To recover under the terms of the sublease the plaintiffs were required to show that the condition in which the premises were returned to plaintiff Bruce was different from the condition when the subtenants took possession and that the difference amounted to a compensable injury to the plaintiffs or either of them. We first examine the defendants' argument that the subtenants were absolved of any claim by plaintiff

owner for a breach of the prime lease by plaintiff Bruce. The sublease specifically states:

"The undersigned hereby for itself, its successors and assigns, executes this agreement as Owner of the demised premises for the following express purposes:

\* \* \*

(d) To acknowledge that said Health-A-Teria, Inc. and Sherwin-Gail Co. shall have no liability with respect to or responsibility for any of Lessee's promises, covenants, representations or obligations under said lease between Medicated Products Co. and the undersigned."

■■ The threshold question is whether plaintiff owner has a cause of action against the subtenants, hence, the defendants, for breach of the covenant to repair and restore the premises. The defendants argue that the above-quoted portion of the sublease precludes plaintiff owner from recovering from the subtenants or themselves on this covenant. The plaintiffs respond, and we agree, that this covenant is one which runs with the land. (*Batavia Manufacturing Co. v. Newton Wagon Co.*, 91 Ill. 230.) Hence, the breach is actionable by the owner. It is clear from the sublease that the parties contemplated that the subtenants be relieved of liability for a breach of contract by plaintiff Bruce, not that the subtenants receive a general covenant not to sue from the plaintiff owner.

Having determined that the subtenants' liability was established and that both plaintiffs have a cause of action for breach of the covenant to repair and restore the premises, we proceed to the issue of damages. This court recently reaffirmed the general rule in Illinois that damages due to a breach of contract are limited to actual losses arising from the breach. (*St. Joseph's Hospital v. Corbetta Construction Co.*, 21 Ill.App.3d 925, 316 N.E.2d 51, modified on rehearing August 19, 1974.) This issue involves the application of that principle to the instant case in which the plaintiffs have presented alternative theories of recovery.

The plaintiffs' first theory is premised upon their assertion that the sale of the subleased premises had no effect on their claim for damages due to the subtenants' breach. The plaintiffs argue that the cost of repairs performed by the purchaser, Austin-Continental, establishes the dollar amount that would have been due them had they elected to make the repairs themselves. No Illinois case has treated this question, but the Federal Court has done so, in a case involving interpretation of Illinois law. (*Bowes v. Saks & Co.* (7th Cir. 1968), 397 F.2d 113.) In that case, the lessee was obligated to restore the premises, made major alterations and failed to comply with the restoration requirement. The building was

sold and the former owner and landlord sued the lessee. The court determined that the lessors had suffered no compensable loss. The case differs from ours in that the purchaser did not intend to have the premises restored. The record in the instant case establishes that the purchaser did in fact make the repairs for which the plaintiffs seek reimbursement.

Though recovery is thus theoretically possible under the *Bowes* rules, the plaintiffs here cannot recover for another reason. Assuming that the purchaser reduced the purchase price by the amount it would have to expend to rehabilitate the premises, the plaintiffs' evidence does not establish their damages because the damaged areas described by Mr. Solomon were not isolated in the evidence of repairs presented by the purchaser. A review of the record reveals no instance where the specific element of damage caused by the subtenants was specifically quantified in repair bills. On this theory, therefore, the plaintiffs cannot recover. Moreover, the plaintiffs' claim that the purchaser considered the building's condition when it made the purchase offer is not enough to establish that the damage done by the subtenants reduced the sale price by a specific dollar amount.

The plaintiffs' second theory of damages is that the sale price of the premises was $60,000 less than it should have been, as a direct result of the subtenants' breach. To prove this claim, the plaintiffs presented the testimony of a real estate broker familiar with real estate values in the area. The trial judge refused to allow him to testify, whereupon the plaintiffs made an offer of proof. The witness would have testified that due to the condition of the building it was worth $60,000 less than it would have been in good repair. The plaintiffs ignore a critical point. Even if this testimony were admitted, it would only describe a general condition, not the diminution in value which resulted from the subtenants' breach. On that basis the plaintiffs could certainly not recover damages. Moreover, there is nothing in this record which shows any damage to plaintiff Bruce; there is no indication that plaintiff owner made any demand for damages or that plaintiff Bruce paid any.

■■ We concur in the reasoning of the *Bowes* decision and propound the rule that sale of leased premises does not automatically bar any action for breach of the covenant to repair and restore the premises. The overriding rule of restitution remains that the injured party be made whole, but that he not receive a windfall. If the plaintiffs here had linked the specific damages done by the subtenants with the specific cost of repair *and* established that the purchaser paid that much less for the building because of the subtenants' breach, or if they could have shown that specific damaged conditions which were caused by the subtenants caused corresponding specific reductions in the market value, they could

have recovered. The plaintiffs failed to establish that the subtenants caused damage which resulted in a compensable loss to them.

For the reasons stated, the judgment is affirmed.

Judgment affirmed.

EGAN, P. J., and GOLDBERG, J., concur.